T. P. TAYLOR, Petitioner, v. NOVA MADISON TAYLOR, Defendant.

Eastern Section.   June 10, 1932.

Petition for Certiorari denied by Supreme Court, November 26, 1932.

Ray H. Jenkins, of Knoxville, for appellant.
J. B. King, of Knoxville, for appellee.

SENTER, J.   This is a divorce suit instituted in the Domestic Relations Court of Knox County, Tennessee, by petitioner, T. P.

Taylor, against the defendant Nova Madison Taylor. The sole ground for divorce relied upon by petitioner is the statutory ground that at the time of his marriage to the defendant on April 17, 1931, the defendant was then pregnant by another man without the knowledge or consent of the complainant. The defendant answered the bill, and by her answer she denied all the allegations in the bill with reference to her ever having had sexual relations with any man other than her husband, and denied specifically that she was, at the time she married petitioner, pregnant by another man.

At the hearing of the cause, the Chancellor held that complainant had failed to make out his case and dismissed the suit.

It appears that both petitioner and the defendant formerly resided in the City of Knoxville, and about November 7 and 8, 1930, the petitioner was then living in Rock Hill, South Carolina, and had been living there for several months prior to November 7, 1930. While he was living in Knoxville before going to Rock Hill, South Carolina, it appears that he was keeping company with the defendant, a young girl about seventeen years of age. The petitioner at that time was about 28 years of age. According to the admissions of both the petitioner and the defendant, they had engaged in sexual relations before petitioner left Knoxville to go to Rock Hill, South Carolina. The young lady's character seemed to have been good, except for her improper relations with petitioner, and there is nothing in the record to indicate that she had ever conducted herself improperly except with the petitioner up until the time he went to Rock Hill, South Carolina. On November 7 the defendant was invited by friends who were going to Rock Hill, South Carolina, in an automobile to spend two days, to drive through with them, and she accepted the invitation, and wired the petitioner that she would reach Rock Hill, South Carolina, that evening. The petitioner met her when she arrived at Rock Hill, and they spent a portion of the night together, and also a part of the next day, and according to the admissions of both parties they engaged in sexual relations both on November 7, or the night of November 7, and on November 8, when the defendant left Rock Hill with her friends, and returned to her home in Knoxville. The defendant had made her home in Knoxville with her aunt. Some time after returning from Rock Hill, she discovered that she was pregnant, and her aunt made the discovery also, and had a State warrant issued for the defendant in Rock Hill, South Carolina, and had him arrested on the charge of a violation of the age of consent law, and he was arrested and returned to Knoxville. He met the defendant at the office of the Justice of the Peace in Knoxville, and she there explained to him in a conversation her condition, and informed him that he was responsible. Whereupon, the petitioner pro-

posed or agreed to marry the defendant, and the charge against him was dismissed upon his marrying the defendant. They lived together in Knoxville as husband and wife for some months, when the petitioner left Knoxville and went to Chattanooga, where he procured employment. After leaving Knoxville he did not contribute toward the support and maintenance of the defendant, and. he was arrested upon a warrant issued at her instance on a charge of abandonment and failing to provide for her and her unborn child. He was discharged from this arrest and the warrant dismissed, and whereupon, he filed his petition in this cause for a divorce.

Petitioner testified that he lived with the defendant in Knoxville until after the lapse of the usual nine months period of gestation, and the child not then having been born, he became suspicious that he was not the father of the unborn child, and left the defendant, claiming that between November 8, 1930, and the time he was married to defendant in April, 1931, he had not been with the defendant. The child was not born until ten months and twenty-one days after November 8, 1930. The defendant testified that she had never at any time engaged in sexual relation with any other man except petitioner, and that she was not with him after November 8, 1930, until they married in April, 1931. The child was born on September 23, 1931. The petitioner introduced Dr. B. B. Howard, a practicing physician of Knoxville, who testified in substance that the normal period of gestation, and for the normal birth of the child, is 280 days from the date of conception; that in some instances some normal women go over a few days, and that it was more usual for the first-born to be a few days less than 280 days. This witness testified that it is an impossibility for a woman to carry a child for the period of 321 days before giving birth to a child; that in his opinion it would be a physical impossibility for a normal woman, who gave birth to a normal child on September 23, 1931, to have become pregnant on November 8, 1930. This witness also stated that the leading medical authorities on the subject of obstetrics supported his opinion. The defendant introduced Dr. Horace E. Brown, a practicing physician, who stated that the normal period of gestation and for the birth of a normal child is approximately 280 days, and he further testified that it is possible for a woman to carry a child for 321 days, and that leading medical authorities on the subject sustained his opinion. After these doctors had testified, the trial judge suggested that by and with the approval of the respective parties, that he would consult other doctors, and it was agreed that the defendant would select one doctor and the petitioner one, and that the court would also select one, and that these three would submit statements on the subject. This resulted in these three addressing a statement to the trial

judge, which is as follows; the statement being signed by Dr. Copenhaver, one of the three selected:

"December 14, 1931.

"Judge Hugh B. Webster,

"Knoxville, Tennessee.

"Dear Judge:—

"Dr. E. R. Zemp, Dr. W. T. McClain and I have talked over the possibility of 321 days pregnancy. Neither of us can quote from our own personal experience as to the probable duration that a woman can carry a child past the expected time, but we all agree on the authenticity of the authorities and quote to you a few.

" 'In Obstetrics, Normal and Operative,' by George Peaslee Shears, Professor of Obstetrics and an Attending Obstetrician at the New York Polyclinic Medical School and Philip F. Williams, Assistant Professor of Obstetrics, Graduate School of Medicine, University of Pennsylvania and Obstetrician to the Maternity Hospital, on Page 44, the following is said with reference to the duration of pregnancy, 'Pregnancies continuing to 300, 302 and 331 days after the only possibility of legal conception have been held possible by decisions of the French, Prussian and English Courts.'

"Quoting from 'Practical Obstetrics' by George W. Jarman, Obstetric Surgeon to the New York Maternity Hospital and Simon Marx, Surgeon to the New York Maternity Hospital and Lecturer on Obstetrics, New York Post-Graduate Medical School and Egbert H. Grandin, Consulting Obstetric Surgeon to the New York Maternity Hospital, on page 68 the following is said: 'There are many undoubted instances of protraction of pregnancy beyond the 320th day after the supposed conception.'

From the edition of 'The Principles and Practice of Obstetrics' by Joseph B. DeLee, Professor of Obstetrics at the Northwestern University Medical School, we quote from Page 117, 'The French law recognized the legitimacy of a child born one hundred eighty days after marriage, and three hundred days after the death of the husband, the German law one hundred eighty-one and three hundred twenty days, respectively. In England in 1921, the legitimacy of a child born three hundred thirty-one days after the husband went to war was allowed. Fothergill reports a cesarean section three hundred and forty-four days after the last coitus. In America each case is decided on its merits. Ciulla found that in 1 case of 200 the pregnancy lasted more than three hundred and twenty days. In some instances labor pains come on at the computed term of pregnancy, but they subside and a

period of three or four weeks elapses until actual delivery occurs.' ''

Dr. Horace Brown testified that he attended and waited upon the defendant during her period of pregnancy and delivered the child on September 25, 1931. He also testified that the male germ, spermatozoa, would sometimes remain dormant in the female organ for as long as fourteen days before it began the process of germination. He also testified that he was familiar with the authorities on the subject and that his conclusions were well supported by recognized medical authority. It will also be observed that in the letter written by Dr. Copenhaver, it is stated that in some instances labor pains come at the usual time, but sometimes subside and a period of three or four weeks will elapse until actual delivery occurs. The letter written by Dr. Copenhaver, which purports to express the opinion of the three doctors selected, was agreed to be treated as evidence in the case given by the three doctors mentioned.

The learned trial judge, held that under these authorities and the evidence of these doctors that in the absence of any evidence showing that the defendant had been guilty of immoral relations with other men, that petitioner had failed to sustain the charges in the bill, and dismissed the same. From this decree, petitioner has appealed and has assigned errors.

The only question presented by the assignment of errors is to the effect that the trial judge erred in holding that under the evidence the defendant was not pregnant by another man without the knowledge of petitioner at the time of the marriage.

In support of this assignment of error appellant relies on the statute in Tennessee, and the Tennessee cases on the subject of the right of inheritance of posthumous children. Section 4170, Shannon's Code, and Section 3269, wherein it is provided that brothers and sisters of an intestate dying without issue, do not inherit his realty unless they were born either before his death, or afterwards within the period of gestation as fixed by law, to-wit: ten calendar months, which is made the subject of a headnote in the case of Melton v. Davidson, 86 Tenn., 129, 5 S. W., 530. It is the contention of appellant that in Tennessee, both by the statutes and by judicial opinion, that children born more than ten months after the death of the husband are illegitimate, and not entitled to inherit. Grimes v. Orrand, 2 Heisk., 298; Melton v. Davidson, 86 Tenn., 129; Baker v. Heiskell, 1 Cold., 642.

The statute and the cases cited are all on the subject of inheritance by after-born children. In neither of these cases do we find the statute applied to the divorce laws. We have not been cited to any case by the Supreme Court of this state, nor have we found any case

by our Supreme Court that deals with the period of gestation in construing this ground for a divorce.

It is urged by appellant that the period of ten months and twenty-one days is contrary to the laws of nature, and the carrying of a child by a woman for that length of time is recognized as a physical impossibility. The authorities, medical authorities, referred to and set forth in the bill of exceptions, do not sustain this contention. It is certainly very unusual, and out of the ordinary, but according to the decided weight of the evidence in this case it is not physically impossible, and medical men of ripe experience state that these authorities are recognized by the medical profession. It is further contended by appellant that to hold that a child could be legitimately born ten months and twenty-one days after conception by the reputed father, would destroy valuable property rights. On the other hand, to disregard the evidence of medical authorities, recognized by the medical profession, and to hold that because it is unusual and out of the ordinary, that the child should be branded as an illegitimate, when it is by no means certain that it is illegitimate, would be a manifest wrong and injustice, both to the child and to the mother.

However, we are of the opinion that the appellant cannot invoke the statutory ground that he seeks to invoke in this case, and upon which his bill for a divorce is based. He admits that he had sexual relations with the defendant before their marriage, and according to the evidence in this record she was a moral girl until she met and had relations with petitioner. If she became immoral it was because of the influence of the petitioner. There is not a word of evidence in the record to the effect that this young woman was immoral, or that she had improper relations with any other man until she met the petitioner, and according to her evidence she did not yield or submit herself to any other man.

In 19 C. J., 40, the general rule is stated as follows:

"The general rule is that a man who has had illicit relations with a woman whom he subsequently marries is not entitled to a divorce upon the ground that he was induced to marry her by false assurances that she was pregnant by him, at least, unless he was defrauded thereby."

In 7 R. C. L., 299, the rule is stated: "It is the generally accepted view, that if he has had sexual intercourse with her before marriage, a decree should not be granted."

In the case of Crehoe v. Crehoe, 97 Mass., 320, a case similar to this, it was held:

"If the complainant had had illicit relations with a woman he married before marriage, he had full knowledge of her unchastity and cannot allege he was induced to contract marriage

by such fraud and deceit on her part as would entitle him to void the contract, although she was at the time of marriage pregnant by another.''

In the case of Seilheimer v. Seilheimer, 40 N. J., 376, the court said on this subject:

"If he has been guilty of ante-nuptial incontinence with her, if before marriage he tempted her and she yielded he has no right to complain of her impurity or deception. He is just as much of a criminal as she is. He has made himself acquainted with her weakness, and knows from personal experience that she is unchaste. If with this knowledge he voluntarily contracted matrimony with her and it afterwards turns out that she was at the time of the marriage pregnant with child by another man, while it must be admitted his situation is a very unfortunate one, it is nevertheless obvious that he is not in a position where he has a right to make complaint against her. In point of moral purity he does not stand a whit higher than she does; he cannot be heard to accuse her, for he is a participant in her crime; he cannot say he was deceived, for he knew she was unchaste; he may say he didn't know all, but he knew enough.''

These cases and authorities are in line with numerous other cases from other jurisdictions, and we think it a sound statement of the law on the subject.

It is true that the Tennessee statute makes it a ground for divorce if the wife, at the time of marriage was pregnant by another man, without his knowledge. Yet this statute, we think, should be construed to meet moral concepts and ideals. If the husband knows that his wife is unchaste, and has himself engaged in illicit sexual relations with her before marriage, and with this knowledge of her unchastity, enters into the marriage contract, it cannot be said that she practiced any fraud or deception upon him, even though she may have become pregnant before marriage by another man.

We are therefore of the opinion that appellant was not entitled to a divorce from the defendant on the grounds alleged in his bill for both reasons herein discussed. It results that we find no error in the decree of the lower court, and it is accordingly affirmed. Appellant and sureties on the appeal bond, will pay the cost of this appeal.

Heiskell and Owen, JJ., concur.